MARION F. EDWARDS, Judge.
| aPlaintiff/appellant, Ginger Franks (“Franks”), appeals a judgment of the Twenty-Ninth Judicial District Court that dismissed her cause of action against the defendant/appellee, St. Charles Parish Sheriff Greg Champagne (“Sheriff Champagne”). Suit was originally filed against the St. Charles Parish Jail, but following an Exception of No Right or No Cause of Action, alleging that no such entity exists, Franks amended her complaint to name Sheriff Champagne. We affirm.
Franks alleged that she was injured when she slipped and fell in a puddle of water while visiting the jail. As a result, *93 she sustained serious injuries. The court found in its judgment that Franks did sustain damages and that her chronic preexisting medical problems were exacerbated by the effects of the incident. However, the court concluded that Franks failed to show that Sheriff Champagne 18was liable for the incident. Thus, the issue of liability is the only one before us at this time.
At trial, the jail’s assistant warden, Frank Graffagnina (“Assistant Warden Graffagnina”), testified that, on the day of the incident, he arrived at the jail at approximately 2 or 3:00 p.m. and was there in the visitor’s room about three hours. He was seated in a chair facing the water fountains, about fifteen feet away, and saw some children, about eight years old, playing near the fountain. He at first testified that the children were near the fountain just a few minutes before the accident; later he stated that the children were there at around 3:00 p.m. and the accident happened at about 4:30 p.m. However, he did not see them spill any water. When Franks went to the bathroom, she slipped and fell. The fountain is between two bathrooms, set back in an alcove, and there was a small puddle of water, but Assistant Warden Graffagnina did not see any water on the floor before Franks fell. There were other employees in and around the area at various times. After Franks fell, someone came to clean the area.
Sergeant Louis Varnado (“SgtVarna-do”) was the commander on duty at the correctional center at the time of the accident. Cleaning in the area is normally done between 6:00 and 9:00 a.m., but if there are reports of spills or mess, trustees will clean it up. Central Control Officer Jennifer Payne (“Officer Payne”) controls the visitation area as well as the rest of the jail after 4:00 p.m. and sits at the control area. Officer Payne’s desk is not positioned to look into the visitation area, and the water fountain would have been to her back. The incident involving Franks occurred at around 4:30 p.m. When Sgt. Varnado received reports of the accident, he was making rounds in the jail pods where the inmates are housed. When he reached the lobby, Franks was still on the floor attempting to get up. Emergency medical service was notified. There was a small amount of water on Lthe floor and some black marks. Assistant Warden Graffagnina told him that children had been playing at the fountain prior to the fall. Sgt. Varnado was not aware of any problem necessitating cleanup until after the accident. If a problem had occurred prior to 4:00 p.m., notification would have been made to Visitation Officer Karen Perry (“Officer Perry”) at the window on the normal shift. Officer Perry would have turned over her duties to Officer Payne.
Franks testified that she had been at the Correctional Center for some time before she fell, attempting to obtain bond for her son. On her way to the restroom, she decided to get some water and when she stopped at the fountain, she slipped. She did not look at the size of the puddle.
Paul Eugene (“Officer Eugene”) was a corrections officer in the St. Charles Sheriffs Office at the time of the accident. Franks had come to obtain a bond reduction, and became a little irate when the office was unable to proceed with the reduction. As Officer Eugene was leaving the area, he heard a loud noise and discovered that Franks had kicked over a chair. Officer Eugene tried to calm her down, but Franks left abruptly and slammed the door. Officer Payne informed him that she was receiving harassing calls from Franks, who was outside smoking a cigarette. Officer Eugene spoke with her about the problem. Less than five minutes later, he was notified of the accident.
*94 Officer Perry testified that she is a deputy in the St. Charles Parish Sheriffs Office and runs visitation at the jail. On the day in question, she did not receive any reports of water or other foreign substance on the floor of the visitation room. If there is a spill, she will clean it up or call the clean up crew. Officer Perry did not recall children playing around the fountain earlier, but there were a lot of people coming and going.
1 sOfficer Payne testified that the control room has eleven television monitors and one desk screen. From her chair she can look out into the booking area of the jail, and the visitor’s area is almost directly behind her. She is the only person in the reception area after 4:00 p.m. Franks was there, and was clearly upset, having an argument with another deputy. Franks then went outside, and Officer Payne could see through the window that Franks was very agitated and acting belligerently. Franks began calling the control center and yelling at Officer Payne. Officer Payne did not see the accident.
Deputy Jessica Matherne (“Deputy Matherne”) testified that she was the booking officer on duty and was summoned to speak with Franks about a problem with a bond at approximately 4:30 p.m. Franks was very irritated and yelled at her. Deputy Matherne called Sgt. Eugene, and then exited the area. She did not see the accident.
On appeal, Franks alleges the court erred by admitting into evidence her verbal dispute with the jail personnel, and by applying the requirement of notice instead of applying LSA-C.C. art. 2315, which Franks urges applies in the present case.
Franks cites cases[1] that apply article 2315 in slip and fall cases involving prisons. However, these cases involved a jail employee and an inmate, respectively, and are not germane to the present facts. The applicable law is LSA-R.S. 9:2800, which states that a public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody. Under that article:
C. Except as provided for in Subsections A and B of this Section, no person shall have a cause of action based | ^solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
D. Constructive notice shall mean the existence of facts which infer actual knowledge.
In interpreting this article, our courts have found as follows:
In order to maintain a claim for damages caused by the condition of things within the care and custody of a public entity, the complainant has the burden of proving that the public body had actual or constructive notice of the hazard and had a reasonable opportunity to remedy the condition, but failed to do so. La.Rev.Stat. Ann. § 9:2800(B); Purolator Courier Corp. v. City of New Orleans, 93-1068, p. 2 (La.App. 4th Cir.3/29/94), 635 So.2d 1232, 1233, writs denied, 94-1509, 642 So.2d 1296, 94-1542 (La.9/23/94), 642 So.2d 1296-97; Rubino *95 v. La. Stadium & Exposition District, 619 So.2d 788, 740 (La.App. 4th Cir.1993). Thus, “the distinction between public bodies’ negligence and strict liability” has been eliminated by statute. Rhodes v. State, DOTD, 95-1848, p. 7 (La.5/21/96), 674 So.2d 239, 242.
... Constructive notice can be found if the conditions which caused the injury existed for such a period of time that those responsible, by the exercise of ordinary care and diligence, must have known of their existence in general and could have guarded the public from injury. LeBlanc v. City of New Orleans, 573 So.2d 1274, 1276 (La.App. 4th Cir.), writ denied, 575 So.2d 826 (La.1991).... [2]
Considering the testimony at trial, we agree with the trial court Franks did not prove that Sheriff Champagne had actual or constructive notice of the puddle. As the court stated, several sheriffs deputies who were on duty that day testified that they had seen nothing out of the ordinary on the floor and received no reports of any foreign substance on the floor prior to the incident. There was uncertainty |7as to the temporal element in the testimony of Assistant Warden Graffagnina, the only witness who testified that there were children playing at the fountain some time prior to the accident. Further, there was no evidence that these children actually spilled water on the floor. There was no testimony as to the nature of the black marks near the puddle, or how long they may have been there. In summary, there was no proof that Sheriff Champagne knew or should have known, by exercise of ordinary diligence, that the puddle existed prior to Franks’ fall, or had a reasonable opportunity to remedy the condition and failed to do so.
Because Franks failed to prove an essential element of her claim, the question of the admission of evidence as to her verbal altercation is not relevant to our determination here, and we decline to address it.
For the foregoing reasons, the judgment is affirmed. Costs are assessed to the plaintiff/appellant, Franks.

AFFIRMED.

. O’Connor v. Litchfield, 864 So.2d 234 (La.App. 1 Cir.2003), writ not considered, 2004-0655 (La.5/7/04), 872 So.2d 1069; Conerly v. State, ex. rel Louisiana State Penitentiary, 858 So.2d 636 (La.App. 1 Cir.2003), writ denied, 2003-2121 (La. 11/14/03), 858 So.2d 432.

. Maldonado v. Louisiana Superdome Comm’n, 95-2490 (La.App. 4 Cir. 1/22/97), 687 So.2d 1087, 1091-92, writ denied, 97-0469 (La.4/18/97), 692 So.2d 448.